UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                      :
CHAIM LEIZEROVICI,              :
                      :
              Plaintiff,    :  **MEMORANDUM DECISION AND**
                      :  **ORDER**
      - against -         :
                      :  17-CV-3605 (BMC)
HASC CENTER, INC., BLIMA DRUKER, :
SAMUAL KAHN, MARK SCHWARTZ,  :
YEHUDA OSIPOV, VLAD TSUPAK,   :
MALKY TROPPER, ABIE HAMUI,    :
YANKY HERTZ,              :
                      :
           Defendants.   :
                      :
-------------------------------------------------------- X

**COGAN,** District Judge.

Plaintiff, an employee of the HASC Center, Inc. ("HASC"), a service provider for the disabled, alleges that he was discriminated against based on race, religion, sex/gender, and was subject to sexual harassment, a hostile work environment, retaliation, and wrongful termination. He brings his claims under Title VII, 42 U.S.C. § 1981, the New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.* ("NYCHRL"). Defendants (HASC and supervisors and employees of HASC) have moved to dismiss all of the claims. For the reasons discussed below, defendants' motion to dismiss is granted and denied in part.

## BACKGROUND

I.    *Religious Discrimination Claims*

Around November 2010, plaintiff began his employment with HASC as a Direct Care Counselor for people with special needs. At the time, he practiced Orthodox Judaism and wore

corresponding religious attire.  Roughly five months later, plaintiff stopped practicing Orthodox

Judaism and began practicing what he describes as "Traditional Judaism."[1]  He accordingly

stopped wearing Orthodox attire.

Around this time, a day shift at HASC opened, and plaintiff asked defendants if he could

switch to that from his overnight position.  Plaintiff describes the day shift as more desirable, and

longer, carrying with it a corresponding increase in pay.  Defendants refused, telling plaintiff that

they would only consider him for the day position if he returned to wearing religious attire.  For

the next two months plaintiff did so, in order to be able to apply for the day shift.

Beginning in May 2011 and continuing through September 2012, plaintiff asked

defendants monthly about receiving medical benefits, and they denied each request.  Plaintiff

claims that HASC gave numerous Orthodox Jewish employees such benefits, and that he knows

this because the employees "bragged about having medical benefits."  During this time, on

several occasions, plaintiff complained to his supervisor, Yanky Hertz, about the disparity in

treatment between himself and Orthodox Jews.  Hertz allegedly acknowledged the disparity, and

told plaintiff that he would speak with management about securing benefits for him.

More than one year later, in September 2012, Samuel Kahn, the Director of HASC,

visited a home where plaintiff was working and noticed that he was not wearing traditional

Orthodox attire.  Kahn allegedly gave plaintiff a dirty look, said "filth," and then remarked,

"we'll see how long you last."  Around that time, Abie Hamui (an HASC employee, the day shift

Senior Counselor, and another of plaintiff's supervisors) told plaintiff that he needed to go to

---

[1] "Orthodox Judaism is distinguished by its maintenance of the traditional forms of worship in the Hebrew language, and of the traditional observances as prescribed by the Torah. Men and women sit separately in Orthodox synagogues and women do not participate in some of the rituals."  Israel & Judaism Studies, http://www.ijs.org.au/Variants-within-Judaism/default.aspx.   (last visited Feb. 26, 2018).  Plaintiff describes that he switched from practicing Orthodox Judaism to practicing "Traditional Judaism," but the practice he describes may accord with better-known "Modern Orthodox," or "Conservative Judaism." See generally Jewish Virtual Library, http://www.jewishvirtuallibrary.org/background-and-overview-of-conservative-judaism (last visited Feb. 26, 2018).

synagogue with HASC residents and wear a yarmulke as well as phylacteries,[2] both accoutrements used in Orthodox practice. Immediately after that conversation, defendants stopped offering plaintiff weekend and Sabbath[3] shifts, which effectively cut his weekly hours from between 60-80 down to 30.

At the end of 2012, plaintiff's friend Menachem Isakov (who has filed a related suit), contacted plaintiff about open positions at HASC. Plaintiff reached out to Malky Tropper (female), a supervisor at HASC, who asked plaintiff what Isakov looked like and what he was studying. Plaintiff described Isakov as an Orthodox Jewish man with a long beard, studying to become a rabbi. Isakov was hired to work a day shift and quickly promoted to the position of Senior Counselor, for which plaintiff had unsuccessfully applied. Around the same time, HASC hired new staff for morning and afternoon shifts, who plaintiff described as ultra-Orthodox,[4] while Hertz cut plaintiff's hours down to 20 per week.

In March 2013, plaintiff asked Tropper if he could apply for other full-time positions. Tropper told him that there were two full-time supervisor positions available for someone with plaintiff's education and skill level. Plaintiff applied, but did not receive either position. Tropper told plaintiff that the denial was "out of her hands." The next month, Tropper told plaintiff that Kahn had instructed HASC management to hire ultra-Orthodox applicants.

---

[2] Jewish religious accessories worn during certain prayers.

[3] "[D]ay of holiness and rest observed by Jews from sunset on Friday to nightfall of the following day." Encyclopedia Britannica, https://www.britannica.com/topic/Sabbath-Judaism (last visited Feb. 26, 2018).

[4] Several religious trends in Judaism can be characterized as "ultra-Orthodox," but "[a]ll [of those] groups stress the need for strict conformity to the religious laws and moral precepts contained in the sacred Jewish texts, the Torah and the Talmud." Encyclopedia Britannica, https://www.britannica.com/topic/fundamentalism#ref252666 (last visited Feb. 26, 2018).

Shortly thereafter, Isakov spoke to Mark Schwartz, his manager and an HASC supervisor, on plaintiff's behalf. Isakov reported to plaintiff that Schwartz had received concerned calls from Kahn, who stated that plaintiff's haircut "wasn't up to the religious code," and expressed disapproval of plaintiff's attire.

Over the summer of 2013, plaintiff began working Sabbath and weekend shifts again, but still without medical benefits. Approximately every other month from September 2013 through January 2015, plaintiff again requested medical benefits from Schwartz and Yehuda Osipov (another of plaintiff's supervisors). Schwartz apparently told plaintiff that he would submit the required paperwork, but plaintiff never received benefits. As he had done before, plaintiff complained to Schwartz about the disparity in treatment between himself and Orthodox Jews, and Schwartz acknowledged the gap. Plaintiff alleges that these employees were of "equal or lesser" qualification than him. Plaintiff also claims that he was working the same number of hours as another HASC employee, Yehoshua Griffith, who was ultra-Orthodox, and Griffith received benefits.

In February 2015, plaintiff suffered a workplace injury that kept him out of work for two months. HASC again denied him benefits in May, and later that month he suffered another injury that kept him out of work until approximately August. From September 2015 through January 2016, plaintiff requested benefits from Schwartz and Osipov roughly every other month, but never received them.

In December 2015, HASC assigned Blima Druker (female) to be an Area Coordinator, in which role she supervised plaintiff. Plaintiff alleges that she gave dirty looks to any non-Orthodox staff member, including him. In February 2016, Schwartz met with plaintiff and told him that Kahn had complained to Schwartz that plaintiff was not observing Sabbath, and that

Kahn said he must cut plaintiff's hours.  Plaintiff lost some of his weekend shifts, resulting in a loss of approximately $450 per shift.  Over the next four months, plaintiff overheard Druker making disapproving comments to others regarding his hair length, beard style, and lack of *peyot*.[5]  Druker remarked to Osipov that plaintiff's hair looked like that of a woman.

II.   *Sexual Harassment/Sex and Gender Discrimination Claim*

From November 2012 through February 2013, plaintiff worked with Vlad Tsupak, a senior counselor who was also plaintiff's supervisor, one day each week, and interacted with him several other days.  Plaintiff alleges that on each interaction, Tsupak made "multiple sexually harassing comments directed at [plaintiff] as well as about [plaintiff's] wife at the time."  Tsupak also asked plaintiff about his sexual orientation and requested that he bring his wife's dirty underwear to work.  In explicit terms, Tsupak repeatedly asked about plaintiff's sex life.  While this was occurring, plaintiff frequently complained to his manager, Hertz.  During more than one of these conversations, plaintiff threatened legal action.  Hertz told plaintiff that he would speak with Tsupak.  At the start of 2013, plaintiff also complained to Hamui about Tsupak.  Hamui said that he, too, would speak with Tsupak.

Starting in June 2015, and continuing through September of that year, plaintiff worked more shifts with Tsupak, who continued to make sexually explicit comments, no longer about plaintiff's wife, but about plaintiff's girlfriend.  Plaintiff again complained to Schwartz multiple times, and again discussed taking legal action.  Schwartz said that plaintiff was not the first person to bring this behavior to his attention.  In September 2015, plaintiff complained about Tsupak to his supervisor, Osipov.  Plaintiff told Osipov that he could smell alcohol on Tsupak's breath.  Osipov said he would handle it.

---

[5] Sideburns grown in accordance with Orthodox Jewish tradition.

From October 2015 through March 2016, Tsupak continued to make sexually explicit statements to plaintiff, and plaintiff continued to complain to Schwartz. In March 2016, plaintiff told Schwartz that if Tsupak showed up on plaintiff's shift, plaintiff would leave the shift. Schwartz said that was fine. Plaintiff walked off a shift later that month because of Tsupak's statements.

In July 2016, plaintiff overheard Druker asking Schwartz if plaintiff was the one with the long hair, and saying "[h]e definitely looks like he needs to go." Schwartz then called plaintiff into his office and fired him. Schwartz told plaintiff that his termination was not performance based. That day, another employee informed plaintiff that HASC had already hired new ultra-Orthodox staff.

## DISCUSSION

The Supreme Court has defined the standard on a motion to dismiss for failure to state a claim as a "two-pronged approach." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, a court must construe a complaint's factual allegations as true, but need not accept the veracity of legal conclusions. Id. at 678. A "complaint [will not] suffice if it tenders naked assertions devoid of further factual enhancement." Id. (internal quotations and alterations omitted). Likewise, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions are inadequate . . . ." Cox v. Nassau Cty. Corr. Ctr., No. CV 11-1937, 2013 WL 831194, at *1 (E.D.N.Y. Feb. 15, 2013), report and recommendation adopted, No. 11-CV-1937, 2013 WL 828949 (E.D.N.Y. Mar. 6, 2013). "While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions." ECOR Sols., Inc. v. Malcolm Pirnie, Inc., No. 1:02CV01103, 2005 WL 1843253, at *3 (N.D.N.Y. July 29, 2005).

Second, a court must determine whether the complaint "states a plausible claim for relief," which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

Accordingly, to defeat a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citation omitted). Therefore, the "plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citation omitted). Neither legal conclusions nor "[t]hreadbare recitals of the elements of a cause of action" state a claim because "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678-79 (citation omitted).

I. Claims under Title VII of the Civil Rights Act of 1964

A. *Discrimination*

1. *Timeliness*

"For a Title VII claim to be timely, the alleged discriminatory conduct must have occurred less than 300 days prior to the filing of the [Equal Employment Opportunity Commission ("EEOC")] charge." Taylor v. City of New York, 207 F. Supp. 3d 293, 300 (S.D.N.Y. 2016). "This statutory requirement is analogous to a statute of limitations." Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712 (2d Cir. 1996). "As such, it is meant to put the adversary on notice to defend within a specified period and to promote the right to be free of stale claims." McPherson v. New York City Dep't of Educ., 457 F.3d 211, 214 (2d Cir. 2006)

(internal quotations omitted).  Plaintiff submitted a Charge of Discrimination to the EEOC on

November 18, 2016, and received his Right to Sue Letter on April 19, 2017.[6]  Therefore,

plaintiff may only bring claims under Title VII arising out of discriminatory conduct that took

place after January 23, 2016 (300 days before he filed his EEOC complaint).  See Szuszkiewicz

v. JPMorgan Chase Bank, 12 F. Supp. 3d 330, 338 (E.D.N.Y. 2014).

       "Under Title VII's continuing violation doctrine, if a plaintiff has experienced a

continuous practice and policy of discrimination, the commencement of the statute of limitations

period may be delayed until the last discriminatory act in furtherance of it."  Washington v. Cty.

of Rockland, 373 F.3d 310, 317 (2d Cir. 2004) (internal quotations omitted).  In National

Railroad Passenger Corporation v. Morgan, 536 U.S. 101 (2002), "the Supreme Court made clear

that the word 'practice' in this context refers to a discrete act or single occurrence, and that a

discrete retaliatory or discriminatory act occurred on the day that it happened."  Vega v.

Hempstead Union Free Sch. Dist., 801 F.3d 72, 78-79 (2d Cir. 2015) (internal quotations

omitted).  Therefore, "discrete discriminatory acts are not actionable if time barred, even when

they are related to acts alleged in timely filed charges."  Id. (internal quotations omitted).  "With

respect to claims based on termination, failure to promote, denial of transfer, or refusal to hire,

[Title VII] precludes recovery for *discrete* acts of discrimination or retaliation that occur outside

---

[6] The Court notes that plaintiff's EEOC Charge claims discrimination based on race and religion, but not sex.  It also claims retaliation.  "[A] plaintiff typically may raise in a district court complaint only those claims that either were included in or are 'reasonably related to' the allegations contained in her EEOC charge."  Holtz v. Rockefeller & Co., 258 F.3d 62, 83 (2d Cir. 2001).  However, defendants first raised this argument in their reply, and plaintiff has not had an opportunity to respond.  The Court is therefore not going to consider the argument.

the statutory time period, even if other acts of discrimination occurred within the statutory time period." McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 75 (2d Cir. 2010) (internal citations and quotations omitted).

Plaintiff bears the burden of establishing the applicability of the continuing violations doctrine. See Norman v. Metro. Transit Auth., No. 13-CV-1183, 2014 WL 4628823, at *5 (E.D.N.Y. Aug. 1, 2014), report and recommendation adopted sub nom. Norman v. Metro. Transp. Auth., No. 13-CV-1183, 2014 WL 4628848 (E.D.N.Y. Sept. 15, 2014).

Here, plaintiff merely makes a conclusory assertion that the continuing violation doctrine applies to his discrimination claims. That is insufficient. Plaintiff's allegations of adverse employment actions in violation of Title VII prior to January 23, 2016 are time barred. Accordingly, plaintiff's Title VII discrimination claims are limited to his allegations of 1) being denied requested benefits in January 2016; 2) having his shifts cut in February 2016; and 3) being terminated in July 2016.

### 2. *Sufficiency*

"[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination, [but] dismissal is nevertheless appropriate where the plaintiff failed to allege even the basic elements of a discriminatory action claim." Jones v. City of New York, No. 14-CV-0826, 2015 WL 502227, at *4 (E.D.N.Y. Feb. 5, 2015) (internal citations omitted). Those basic elements are first, that the "mistreatment at work occur[ed] because of . . . [a] protected characteristic," and second, that "the action that is alleged . . . must rise to the level of an adverse employment action." Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007). "[A]n action must cause a materially adverse change in the terms and conditions of employment, and not just "mere inconvenience, in order to qualify as 'adverse.'" Id. Examples of materially adverse changes

include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotations omitted). A plaintiff may plead such allegations "either (1) directly, by alleging facts that show an intent to discriminate, or (2) indirectly, by alleging circumstances that give rise to a plausible inference of discrimination. Guy v. MTA New York City Transit, No. 15-CV-2017, 2016 WL 8711080, at *6 (E.D.N.Y. Sept. 23, 2016) (internal citations omitted).

"It is axiomatic that mistreatment at work . . . is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic." Patane, 508 F.3d at 112 (internal quotations omitted). Further, "[t]o establish an inference of discrimination, a plaintiff must allege that she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." Brown v. Daikin Am. Inc., 756 F.3d 219, 230 (2d Cir. 2014) (internal quotations omitted). "The plaintiff's and comparator's circumstances must bear a 'reasonably close resemblance,' but need not be 'identical.'" Id.

As to the denial of benefits, plaintiff has not alleged any such denial subsequent to January 23, 2016. Even without regard to the time bar, plaintiff has made only a bare allegation that he was "similarly situated" to those employees he claims did receive benefits. Plaintiff's claim that Orthodox employees who did receive benefits were of "equal or lesser" qualification is a mere conclusion. The characterization of these unnamed employees as "equal[ly] or less[]" qualified is plaintiff's opinion; plaintiff pleads no facts to support that opinion. Likewise, plaintiff's assertion that he worked the same number of hours as an Orthodox employee who plaintiff claims did receive benefits is insufficient because it does not allege facts tending to

show that he and that employee were otherwise materially similarly situated with regard to performance, experience, qualification, or position.

On the other hand, plaintiff's second allegation of discrimination – that his shifts were cut because of his religious practice –states a claim under Title VII. Case law within the Second Circuit provides that discrimination based on mode of practice or observance can support a claim of religious discrimination. See e.g., Shain v. Ctr. for Jewish History, Inc., 418 F. Supp. 2d 360, 367 (S.D.N.Y. 2005). Plaintiff alleges that Kahn – the director of HASC – complained to Schwartz about plaintiff's non-observance of Shabbat, and stated that his hours should be cut. Plaintiff then lost his weekend shifts, from which he had earned roughly $450 per week. Plaintiff sufficiently alleges that this loss occurred because of a protected characteristic – his mode of religious practice. Furthermore, his change in circumstance rises above inconvenience; it clearly had a material impact on his take-home pay.

Likewise, plaintiff's third allegation of discrimination – that he was terminated because he did not practice Orthodox Judaism – states a claim under Title VII. In the months leading up to his firing, plaintiff heard Druker make disapproving comments about his hair length, beard style, and lack of *peyot*. In making these comments, Druker, a manager, singled out aspects of plaintiff's appearance that distinguished him from his Orthodox co-workers in a manner highly suggestive of discriminatory intent. She did not say, for instance, that he looked slovenly, unkempt, or any other range of adjectives that would not implicate plaintiff's mode of religious observance. Against that background (indeed, right up until the month before he was terminated), Druker's comment on the day of his termination that plaintiff "definitely looks like he needs to go," is best understood as implying that plaintiff looked like he needed to go because

he did not look like an Orthodox Jew. Moreover, Schwartz told Chaim that his termination was not performance based, which again supports a plausible inference of discriminatory intent.

Plaintiff, in sum, describes that defendants – a healthcare agency that seems to primarily serve the Orthodox community, and its managers who apparently practice Orthodox Judaism – imposed the requirements of their religious practice upon him, and fired him for his non-compliance. At the pleading stage, plaintiff does not need to claim any more than he has; he has clearly alleged facts sufficient to "nudge" his claim of religious-based discrimination[7] "across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

> B. *Hostile Work Environment*

> 1. *Timeliness*

As noted above, discrimination claims based on "discrete acts" that fall beyond the statutory time period are precluded under Title VII. See McGullum, 609 F.3d at 75. On the other hand,

> [h]ostile work environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Accordingly, consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period.

Id. (internal citations and quotations omitted). In other words, so long as one event contributing to a hostile work environment claim is alleged to have occurred after the look-back period cutoff,

---

[7] Plaintiff alleges race discrimination as well, but at no point in his complaint does he make any allegation that he was treated differently because of his race, ancestry, or ethnicity, as opposed to because of the mode of his religious practice.

that later violation "anchors" earlier, related acts, and the continuing violation doctrine allows the presentation of a timely, single claim.

Here, plaintiff's allegations of a hostile work environment can be placed into one of two categories: the first includes comments allegedly made by defendants to express their displeasure over his appearance, which apparently fell short of Orthodox standards, and the second includes Tsupak's sexually themed remarks. Because incidents for each of these claims fell within the statutory period, the Court can consider plaintiff's earlier hostile work environment allegations, as well.

### 2. *Sufficiency*

To state a hostile-work environment claim under Title VII, a plaintiff must plead facts showing that his workplace is "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citation omitted) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)). "[T]he plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (internal quotations omitted). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." Littlejohn v. City of New York, 795 F.3d 297, 321 (2d Cir. 2015). Critically, the complained of conduct must have been prompted by the plaintiff's status.

"It is axiomatic that mistreatment at work . . . is actionable under Title VII only when it occurs because of an employee's protected characteristic." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001); see e.g., Davis v. New York City Dep't of Corr., No. 17-CV-3863, 2017 WL 5634123, at *5 (E.D.N.Y. Nov. 22, 2017) ("Plaintiff fails to allege any relationship between such conduct and his status as a member of a protected class."); Richard v. New York City Dep't of Educ., No. 16-CV-957, 2017 WL 1232498, at *14 (E.D.N.Y. Mar. 31, 2017) ("Plaintiff does not state a hostile work environment claim because his allegations are insufficient to allege animus based on his race, color or ethnicity."). In assessing a hostile work environment claim, "courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." Moll v. Telesector Res. Grp., Inc., 760 F.3d 198, 203 (2d Cir. 2014) (internal quotations omitted).

Anti-discrimination laws "are intended to protect employees from genuine workplace mistreatment and harassment; they are not intended to guarantee that employees will never suffer inconveniences or that their every desire will be fulfilled." Ruggieri v. Harrington, 146 F. Supp. 2d 202, 218 (E.D.N.Y. 2001). Hostile work place claims should "not [be] intended to promote or enforce civility, gentility or even decency." Bermudez v. City of New York, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011). Thus, "Title VII does not establish a 'general civility code' for the American workplace." Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004). "Isolated instances of harassment ordinarily do not rise to this level." Sclafani v. PC Richard & Son, 668 F. Supp. 2d 423, 430 (E.D.N.Y. 2009).

First, plaintiff alleges that a number of plaintiff's employees mocked him because of his hairstyle, that Kahn gave him a dirty look, and that he overheard Druker making disapproving remarks about him. These allegations fall far short of the exacting standard required to state a

claim for a hostile workplace environment, which demands that a plaintiff claim that the conditions of his employment have been materially altered by discriminatorily motivated abuse. The conduct here is akin to the kind of "simple teasing, offhand comments, and isolated incidents (unless extremely serious) [that] will not amount to discriminatory changes in the terms and conditions of employment." Smith v. HBO, No. 12-CV-2177, 2013 WL 2285185, at *3 (E.D.N.Y. May 22, 2013) (internal quotations and alterations omitted); see also Trachtenberg v. Dep't of Educ. of City of New York, 937 F. Supp. 2d 460, 472 (S.D.N.Y. 2013) (plaintiff, a teacher, failed to state a claim for a hostile work environment when her principal "would frequently stand . . . and stare [at her] in an effort to intimidate her.") (internal quotations and alterations omitted).

Second, plaintiff alleges that Tsupak made a host of sexually explicit comments. However, Tsupak's remarks were not based on plaintiff's membership in a protected class, but instead, on his wife's and girlfriend's status in a protected class. To give rise to a hostile work environment claim, "the conduct at issue cannot be merely tinged with offensive sexual connotations, but must actually constitute discrimination because of sex." Merhige-Murphy v. Vicon Indus., Inc., No. CV-07-1526, 2008 WL 111163, at *3 (E.D.N.Y. Jan. 7, 2008) (internal quotations and alterations omitted); see e.g., Marchioli v. Garland Co., No. 5:11-CV-124, 2011 WL 1983350, at *5 (N.D.N.Y. May 20, 2011) ("[P]laintiff fails to allege that the alleged hostile work environment was created because of his sex. Rather, all of the allegations in the complaint allege that he was harassed because of his girlfriend's pregnancy and the fact that he was soon to be a parent.").

In Dottolo v. Byrne Dairy, Inc., No. 08-CV-0390, 2010 WL 2560551, at *5 (N.D.N.Y. June 22, 2010), the plaintiff's supervisor asked him a vulgar question about his wife (remarkably

similar to some of those Tsupak asked plaintiff). Acknowledging that the question was "juvenile, crude and vulgar," the court there nevertheless held that "[p]laintiff has failed to allege facts plausibly suggesting that [the supervisor] posited an unwelcome question to [p]laintiff *because* of his sex." Id. (emphasis added). "Such remarks, while deplorable, are precisely the sort of non-work-related social comments that . . . fall outside the scope of employment discrimination law." Nicolosi-Russo v. Program Brokerage Corp., No. 05 CIV. 9373, 2006 WL 3690654, at *3 (S.D.N.Y. Dec. 13, 2006). Claims "relying solely on allegations of defendant's discriminatory attitude toward, or treatment of, non-employees," are insufficient. Id.

Fatal to plaintiff's hostile work environment claim is the rule that "an *offensive* work environment does not constitute a *hostile work environment* in the statutory sense unless the offensiveness is discriminatorily inflicted on members of a protected group" of which plaintiff is a member. Id. Tsupak's alleged remarks were crude, but not actionable under Title VII.

Finally, Tsupak's stray questions about plaintiff's sexual orientation are neither sufficiently severe nor pervasive to support a hostile work environment claim.

## C. *Retaliation*

### 1. *Timeliness*

Because plaintiff's retaliation claim turns on discrete adverse acts, it, like his discrimination claim, discussed above, requires the underlying act to have occurred within the statutory period. As with his discrimination claim, plaintiff has not met his burden of showing that the continuing violations doctrine applies to his retaliation claim. Accordingly, plaintiff is limited to pleading retaliation based on losing his weekend shifts in February 2016, and being terminated in July 2016.

2. *Sufficiency*

Title VII provides that an employer may not "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful practice [by Title VII.]" 42 U.S.C. § 2000e–3(a). "Retaliation occurs when an employer takes action against an employee not because of his ethnicity, but because he engaged in protected activity – complaining about or otherwise opposing discrimination." <u>Vega</u>, 801 F.3d at 91. Therefore, "for a retaliation claim to survive . . . a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated – or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." <u>Id.</u> at 89-90. "Unlike Title VII discrimination claims, however, for an adverse retaliatory action to be 'because' a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." <u>Id.</u> at 90.

"[I]n the context of a Title VII retaliation claim, an adverse employment action is any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination." <u>Id.</u> at 90 (internal quotations omitted). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII." <u>Id.</u> "Protected activity for purposes of Title VII [] retaliation claims encompasses an employee's complaint to supervisors about alleged unlawful activity, even if the activity turned out not to be unlawful, provided that the employee had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII." <u>Irons v. Bedford-Stuyvesant Cmty. Legal Servs.</u>, No. 13-CV-4467, 2015 WL 5692860, at *19 (E.D.N.Y. Sept. 28, 2015).

"A plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action."  Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010) (internal quotations and alterations omitted).  There is no bright line rule in the Second Circuit for the duration of a period between a protected activity and an adverse action that can support such an inference.  See Ellis v. Century 21 Dep't Stores, 975 F. Supp. 2d 244, 284 (E.D.N.Y. 2013) (collecting cases).  However, courts in the circuit have held that four and five month gaps are not too attenuated.  See Id. (collecting cases).

Plaintiff alleges that he complained about two things: Tsupak's offensive comments (which he last complained about in March 2016), and his denial of benefits (which he last complained about in January 2016).  Plaintiff could in good faith have reasonably believed that Tsupak's comments constituted a hostile work environment; likewise, the fact that plaintiff has failed to state a discrimination claim based on denial of benefits is not fatal to his retaliation claim.  See Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C., 716 F.3d 10, 17 (2d Cir. 2013).  The problem with plaintiff's claim is that he does not plausibly allege that either his four month old complaints about Tsupak or his seven month old complaints about his denial of benefits were a "but-for" cause of termination.  Had plaintiff described that he complained and was fired within a month, or even two, of his complaints, he would likely have stated a claim. But it is not plausible that defendants acquired a retaliatory intent from plaintiff's complaints and then took half of a year before acting, and that during all of those intervening months plaintiff's complaints remained the but-for cause of his eventual termination.

II.    The Civil Rights Act of 1866

Section 1981 of Title 42 of the United States Code guarantees in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a) (emphasis added).  Section 1981 thus "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment."  Patterson v. Cty. of Oneida, N.Y., 375 F.3d 206, 224 (2d Cir. 2004).

However, "[i]t is [] settled that Section 1981 does not prohibit discrimination on the basis of gender or religion . . . ."  Anderson v. Conboy, 156 F.3d 167, 170 (2d Cir. 1998); see also Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613 (1987).  Although the Second Circuit has held that the Jewish "race" is protected under § 1981 from race-based discrimination, United States v. Nelson, 277 F.3d 164, 177-78 (2d Cir. 2002), the statute does not provide a remedy for discrimination against Jews that turns on the mode of their religious observance, as opposed to their ancestry.  See e.g., Kratz v. Coll. of Staten Island, No. CIV.A. 96-CV-0680, 2000 WL 516888, at *3 (E.D.N.Y. Mar. 15, 2000) (Holding summary judgment dismissing plaintiff's § 1981 claim called for when plaintiff alleged only that he was discriminated against "for being a non-observant Jew," because plaintiff had not described discrimination based on his Jewish ancestry.).

Plaintiff's claim for religious-based discrimination thus is not actionable under § 1981.

III.   NYSHRL Claims

Plaintiff's NYSHRL discrimination claims are "analyzed identically" to his Title VII claims, and "the outcome of an employment discrimination claim made pursuant to the

NYSHRL is the same as it is under Title VII." Diaz v. Local 338 of Retail, Wholesale, Dep't
Store Union, United Food & Commercial Workers, No. CV 13-7187, 2014 WL 4364819, at *4
(E.D.N.Y. Aug. 20, 2014), report and recommendation adopted, 2014 WL 5502316 (E.D.N.Y.
Oct. 28, 2014).  Therefore, plaintiff may proceed with his religious-based discrimination claims
under the NYSHRL to the extent set forth above.

However, plaintiff's NYSHRL claims are subject to a three-year statute of limitations.
See Joseph v. Beth Israel Med. Ctr., No. 13-CV-02961, 2014 WL 204483, at *8 (E.D.N.Y. Jan.
17, 2014).  Accordingly, under that statute he could have asserted claims for conduct dating back
to June 15, 2014.  Nevertheless, between that date and January 23, 2016 – the cutoff date for his
Title VII claims – plaintiff has not alleged that he was subject to any adverse employment
actions other than alleged continued denial of benefits.  As described above, his claim as to that
fails.

"Hostile work environment . . . claims under the NYSHRL are generally governed by the
same standards as federal claims under Title VII." Schiano v. Quality Payroll Sys., Inc., 445
F.3d 597, 609 (2d Cir. 2006).  Accordingly, plaintiff's hostile work environment claim under the
NYSHRL is dismissed along with his Title VII claim.

The same analysis applies to retaliation claims brought under the NYSHRL and Title VII.
See Id., 445 F.3d at 609 ("[R]etaliation claims under the NYSHRL are generally governed by the
same standards as federal claims under Title VII.").  Plaintiff's NYSHRL retaliation claim is
dismissed.

Plaintiff also brings claims under the NYSHRL for aiding and abetting.  "The NYSHRL
states that it shall be an unlawful discriminatory practice for any person to aid, abet, incite,
compel or coerce the doing of any of the acts forbidden under" the statute.  Feingold v. New

<u>York</u>, 366 F.3d 138, 157-58 (2d Cir. 2004). "[A]n individual defendant may be held liable under the aiding and abetting provision of the NYSHRL if he "actually participates in the conduct giving rise to a discrimination claim." <u>Rojas v. Roman Catholic Diocese of Rochester</u>, 660 F.3d 98, 107 fn.10 (2d Cir. 2011).[8]

Plaintiff has stated a claim for aiding and abetting liability against several defendants: Druker allegedly made the decision to fire him; Schwartz actually terminated his employment; and Kahn directed his hours to be cut. Because, as discussed above, a plausible inference can be drawn that defendants committed these acts based on a common discriminatory motivation, plaintiff may proceed with his aiding and abetting claim against these defendants.

However, plaintiff has not stated a claim for aiding and abetting liability against the remaining defendants: Osipov was allegedly only the recipient of plaintiff's complaints about Tsupak and being denied benefits, and as discussed above, neither Tsupak's vulgarity nor plaintiff's denial of benefits support a claim of discrimination; Tsupak is not alleged to have aided and abetted anyone else's discrimination; and plaintiff makes no allegations about Tropper, Hamui, or Hertz within the three-year NYSHRL statute of limitations.

IV.  <u>NYCHRL Claims</u>

"Courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." <u>Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.</u>, 715 F.3d 102, 109 (2d Cir. 2013) (internal citations and

---

[8] <u>See</u> <u>Conklin v. Cty. of Suffolk</u>, 859 F. Supp. 2d 415, 436 (E.D.N.Y. 2012) ("Nevertheless, the law in this Circuit seems clear that a defendant may be held liable for aiding and abetting allegedly unlawful discrimination by her employer even where her actions serve as the predicate for the employer's vicarious liability. However, as the employee's liability necessarily hinges on that of the employer, the employer must be held liable for an individual to also be held liable under this provision.").

quotations omitted). "[E]ven if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." Id. "The statute of limitations for claims under . . . [the] NYCHRL is three years." Soloviev v. Goldstein, 104 F. Supp. 3d 232, 246 (E.D.N.Y. 2015).

A. *Discrimination*

To state a discrimination claim under the NYCHRL, the plaintiff "must only show differential treatment of any degree based on a discriminatory motive." Gorokhovsky v. N.Y.C. Hous. Auth., 552 Fed. App'x 100, 102 (2d Cir. Jan. 29, 2014) (quoting Mihalik 715 F.3d at 114); see also Pryor v. Jaffe & Asher, LLP, at *3 (S.D.N.Y. Jan. 15, 2014) (citing Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 872 N.Y.S.2d 27, 39 (2009)). "[U]nlike under state and federal law, plaintiff need not show that an employment action was materially adverse." Sotomayor v. City of New York, 862 F. Supp. 2d 226, 258 (E.D.N.Y. 2012), aff'd, 713 F.3d 163 (2d Cir. 2013). However, "[t]he plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive . . . *i.e. because of* the protected characteristic." Soloviev, 104 F. Supp. 3d 232, 250 (E.D.N.Y. 2015) (internal quotations and alterations omitted) (emphasis in original).

Since plaintiff has satisfied his pleading burden under Title VII and the NYSHRL as to religious-based discrimination, his religious discrimination claim also passes under the more liberal standard used for the NYCHRL. However, his claims for race and gender based discrimination fail under the NYCHRL because plaintiff simply does not allege differential treatment based on either of those protected characteristics.

Plaintiff also asserts aiding and abetting claims under the NYCHRL. "The same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL apply to

such claims under the NYCHRL because the language of the two laws is 'virtually identical.'" Feingold v. New York, 366 F.3d 138, 158 (2d Cir. 2004).

Because plaintiff has adequately plead his aiding and abetting claim under the NYSHRL against certain defendants, he may proceed against them with a congruent NYCHRL claim.

B. *Hostile work environment*

To state a hostile work environment claim under NYCHRL, a plaintiff need only allege differential treatment of any degree based on a discriminatory motive. See Gorokhovsky, 552 Fed. App'x at 102 (citing Mihalik, 715 F.3d at 114). "In a hostile work environment claim under the NYCHRL, even a single comment may be actionable in appropriate circumstances." Id. (internal quotations omitted). "Under the NYCHRL, defendants' discriminatory conduct need not be 'severe or pervasive' to create an actionable hostile work environment." Sotomayor, 862 F. Supp. 2d at 261. However, "notwithstanding the liberal construction accorded to such claims . . . the NYCHRL is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives." Berlyavsky v. New York City Dep't of Envtl. Prot., No. 14-CV-03217, 2015 WL 5772266, at *11 (E.D.N.Y. Aug. 28, 2015), report and recommendation adopted as modified, No. 14-CV-3217, 2015 WL 5772255 (E.D.N.Y. Sept. 30, 2015).

As described above, plaintiff alleges that he was mocked because of his hair style, that Kahn gave him a dirty look, and that he overheard Druker making disapproving remarks about him. Although this conduct falls short of the standard for stating a claim under either Title VII or the NYSHRL, it is sufficient under the NYCHRL.

However, plaintiff has not stated a claim for a hostile workplace based on his gender and sex under the NYCHRL for the same reason that these claims fail under Title VII and the

NYSHRL.  For his argument, plaintiff relies on Tsupak's vulgar comments.  But as discussed above, plaintiff has not alleged that they were driven by discriminatory animus against a protected characteristic of *his*, as opposed to of his wife or girlfriend.

C.  *Retaliation*

"[T]o prevail on a retaliation claim under the NYCHRL, a plaintiff need only show that he took an action opposing [his] employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." Anglisano v. New York City Dep't of Educ., No. 14-CV-3677, 2015 WL 5821786, at *10 (E.D.N.Y. Sept. 30, 2015) (internal quotations and citations omitted).

The "but-for" causal requirement of Title VII retaliation claims is replaced in the NYCHRL context with an easier to satisfy requirement that a plaintiff allege only that the challenged "conduct is caused at least in part by discriminatory or retaliatory motives."  Mihalik, 715 F.3d at 113.  Accordingly, plaintiff may proceed with his NYCHRL retaliation claim on the basis of his complaints about Tsupak and his denial of benefits before his termination.  Plaintiff has plausibly alleged that his termination was "caused at least in part" by his repeated complaints.

D.  *Interference*

 "Section 8-107(19) of the NYCHRL prohibits any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the enjoyment of . . . any right granted or protected pursuant to this section."   N.Y. City Admin. Code § 8-107(19).  In other words, Section 8-107(19) "makes actionable intimidation, threats or interference with . . . a person's exercise or enjoyment of rights protected under [the NYCHRL]."  Harrison v. SUNY Downstate Med. Ctr., No. 16CV1101, 2017 WL 4326507, at *6

(E.D.N.Y. Sept. 25, 2017). "Threats are required to state a claim for violation of [Section 8-107(19)]." Keles v. Yearwood, 254 F. Supp. 3d 466, 476 (E.D.N.Y. 2017). "As defined in the Second Circuit, a 'threat' is the creation of an impression of impending injury." Sletten v. LiquidHub, Inc., No. 13 CIV. 1146, 2014 WL 3388866, at *5 (S.D.N.Y. July 11, 2014) (internal quotations and alterations omitted).

Plaintiff does not allege that any threats were made against him. Accordingly, his claim that defendants interfered with a right he enjoys under the NYCHRL is dismissed.

E. *Employer Liability*

"The NYCHRL imposes strict liability on employers for discriminatory acts of managerial employees." Garrigan v. Ruby Tuesday, Inc., No. 14 CIV. 155, 2014 WL 2134613, at *6 (S.D.N.Y. May 22, 2014). "Under NYCHRL, an employer is liable for the discriminatory acts of its employees if the employer (1) knew about the employee's conduct and failed to take immediate corrective action, or (2) should have known of the employee's conduct and failed to exercise due diligence to prevent it." Hopper v. Banana Republic, LLC, No. 07 CIV. 8526, 2008 WL 490613, at *3 (S.D.N.Y. Feb. 25, 2008). As described above, plaintiff alleges discriminatory conduct and a hostile work environment caused, in part, by defendants in a managerial position. A plausible inference may be drawn from his factual allegations that HASC had actual and constructive knowledge of its managers' conduct. Plaintiff has therefore stated a claim for employer liability under the NYCHRL.

## CONCLUSION

Defendants' motion to dismiss is granted in part and denied in part as set forth above.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
February 27, 2018